Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3278 | **DATE** | 11/22/2002 |
| **CASE TITLE** | JAMES MILES, III, et al vs. S.C. JOHNSON & SON, INC., et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]    ENTER MEMORANDUM OPINION AND ORDER: Defendants' Rule 12(b)(6) motions to dismiss the claims asserted against them are granted. Plaintiffs have twenty-one days from the date of this Memorandum Opinion and Order to amend their claims in accordance with this Opinion, if they can do so and remain in compliance with Rule 11. If no amendment is filed in that time period, the claims will be dismissed with prejudice.

(11) ■    [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | NOV 25 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | U.S. DISTRICT COURT | | 150 |
| | Mail AO 450 form. | CLERK | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | 02 NOV 22 PM 3:18 | | |
| TBK | courtroom deputy's initials | 01 03-0371J | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



| | |
|---|---|
| JAMES MILES, III, a minor, by his Mother and Next Friend, JULIA A. RAGSDELL, and JULIA A. RAGSDELL, individually, Plaintiffs, v. S.C. JOHNSON & SON, INC., et al., Defendants. | No. 00 C 3278<br>Paul E. Plunkett, Senior Judge |

## MEMORANDUM OPINION AND ORDER

Julia Ragsdell has sued defendants S.C. Johnson & Company ("SCJ"), Precise Technology, Inc. ("Precise") and Ball Corporation ("Ball")[1], on her own behalf and on behalf of her son James, to recover for the injuries he sustained when he ingested Drano. She asserts claims of negligence, willful and wanton conduct and strict liability against all three defendants and claims for breach of the implied warranty of merchantability against SCJ. Defendants have filed motions pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss the second amended complaint on the grounds that all of the claims are preempted by the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. § 1261, et seq. and the Poison Prevention Packaging Act ("PPPA"), 15 U.S.C. § 1471, et seq. For the reasons set forth below, the motions are granted.

---

[1] Another defendant, Malco Products, Inc., was previously dismissed from the suit. (See 9/20/02 Min. Order.)



## The Legal Standard

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. Forseth v. Village of Sussex, 199 F.3d 363, 368 (7th Cir. 2000). No claim will be dismissed unless "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

## Discussion

The doctrine of preemption is grounded in the Supremacy Clause of the Constitution, which states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. CONST., art. VI, cl. 2. Federal law may preempt state law expressly, or impliedly through the doctrines of field and conflict preemption. Boomer v. AT&T Corp., No. 02-2667, 2002 WL 31202126, at *8 (7th Cir. Oct. 3, 2002). If a federal law explicitly says that it preempts state law, express preemption applies. Id. If "Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law," field preemption applies. Time Warner Cable v. Doyle, 66 F.3d 867, 875 (7th Cir. 1995) (internal quotation marks and citation omitted). Finally, if there is a direct conflict between federal and state law, when "it either is impossible to comply with both, or when state law stands as an obstacle to the accomplishment of the full congressional objectives," then conflict preemption applies. Id. (internal quotation marks and citation omitted).

The FHSA prohibits "[t]he introduction . . . into interstate commerce of any misbranded hazardous substance or banned hazardous substance." 15 U.S.C. § 1263(a). Among others, the Act

2

defines as a "hazardous substance" any substance that the Consumer Products Safety Commission ("CPSC") by regulation deems hazardous. 15 U.S.C. § 1261(f)(1)(B); see 15 U.S.C. § 1261(f)(1)(A) (also defining "hazardous substance" as "[a]ny substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substances or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children"). The CPSC has determined that sodium hydroxide, the primary ingredient in Drano, is a hazardous substance. 16 C.F.R. § 1500.129(j). "A misbranded hazardous substance" is a hazardous substance . . . intended, or packaged in a form suitable, for use in the household or by children, if the packaging or labeling of such substance" does not comply with the FHSA, the PPPA and the regulations promulgated under them. 15 U.S.C. § 1261(p).

The PPPA requires manufacturers of hazardous substances like Drano to comply with special packaging requirements mandated by the CPSC. 15 U.S.C §§ 1471(2)(A), 1472(a); see 16 C.F.R. § 1700.14(a)(5) (designating sodium hydroxide as a substance that requires special packaging). "Special packaging" is defined as "packaging that is designed or constructed to be significantly difficult for children under five years of age to open or obtain a toxic or harmful amount of the substance contained therein within a reasonable time and not difficult for normal adults to use properly." 15 U.S.C. § 1471(4). The regulations promulgated pursuant to the statute set forth detailed testing procedures for special packaging, 16 C.F.R. § 1700.20, and require such packaging to have "[c]hild-resistant effectiveness of not less than 85 percent without a demonstration and not

less than 80 percent after a demonstration of the proper means of opening" the packaging. 16 C.F.R. § 1700.15(b)(1).

The FHSA has an explicit preemption clause, which says:

> Except as provided in paragraphs (2) and (3), if a hazardous substance or its packaging is subject to a cautionary labeling requirement under section 2(p) or 3(b) [subsec. (p) of this section or section 1262(b) of this title] designed to protect against a risk of illness or injury associated with the substance, no State or political subdivision of a State may establish or continue in effect a cautionary labeling requirement applicable to such substance or packaging and designed to protect against the same risk of illness or injury unless such cautionary labeling requirement is identical to the labeling requirement under section 2(p) or 3(b) [subsec. (p) of this section or section 1262(b) of this title].

15 U.S.C. § 1261, Note (b)(1)(A). There are two exceptions to that rule: (1) a state may establish non-identical requirements applicable to hazardous substances solely for its own use if they provide greater protection than the FHSA requirements; and (2) upon application, the CPSC will permit a state to enforce a requirement that does not conflict with the FHSA, provides greater protection than the FHSA requirement and does not unduly burden interstate commerce. 15 U.S.C. § 1261, Notes (b)(2), (3).

The PPPA has a nearly identical preemption provision:

> [W]henever a standard established by the Commission under this Act applicable to a household substance is in effect, no State or political subdivision thereof shall have any authority either to establish or continue in effect, with respect to such household substance, any standard for special packaging (and any exemption therefrom and requirement related thereto) which is not identical to the standard established under section 1472 of this title (and any exemption therefrom and requirement related thereto) of this Act.

15 U.S.C. § 1476(a). The preemption exceptions are also the same: (1) a state may establish non-identical packaging requirements applicable to substances for its own use if they provide greater protection than the PPPA requirements; and (2) upon application, the CPSC will permit a state to

4

enforce a requirement that does not conflict with the PPPA, provides greater protection than the PPPA requirement and does not unduly burden interstate commerce. 15 U.S.C. § 1476 (b), (c).

These preemption clauses demonstrate that Congress intended to preempt at least some state law. Cf. Medtronic, Inc. v. Lohr, 518 U.S. 470, 484 (1996) (saying that existence of express preemption clause in the Medical Device Amendments of 1976 ("MDA") establishes that "Congress intended the [statute] to pre-empt at least some state law.") The question is how much?

The answer to that question, of course, lies in Congressional intent. We divine Congress' intent primarily from "the language of the pre-emption statute and the statutory framework surrounding it." Medtronic, 518 U.S. at 486 (internal quotation marks and citation omitted). We may also consider the "the structure and purpose of the statute as a whole," including "the way in which Congress intended the statute and its surrounding regulatory scheme to affect, business, consumers, and the law." Id. (internal quotation marks and citation omitted). Any interpretation of the statute, however, must be grounded on "the assumption that the historic police powers of the States [are] not . . . superseded by the Federal Act unless that [is] the clear and manifest purpose of Congress." Id. at 485 (internal quotation marks and citation omitted).

Plaintiffs say that Congress' use of the word "requirement" in these preemption clauses reveals its intent that the statutes preempt only positive laws and enactments. Common-law causes of action, plaintiffs point out, are not generally referred to as "requirements" or as being "established" or "continued in effect," as stated in the preemption clauses. Similarly, plaintiffs argue, states are not likely to establish a labeling or packaging "cause of action" for hazardous substances they use, as one of the preemption exceptions to each statute contemplates. Aside from the textual

tension, plaintiffs say that the very absence of the term "cause of action" from the preemption clauses says something about Congress' intent. In the words of the Supreme Court:

> If Congress intended to preclude all common-law causes of action, it chose a singularly odd word with which to do it. The statute would have achieved an identical result, for instance, if it had precluded any "remedy" under state law relating to medical devices. "Requirement" appears to presume that the State is imposing a specific duty upon the manufacturer....

Medtronic, 518 U.S. at 487 (discussing the MDA).

The Medtronic Court did not, however, hold that the term "requirements," as used in the MDA, necessarily excludes common law. On the contrary, the Court specifically declined to decide that issue. Id. at 502-03. Moreover, in Cipollone v. Leggett Group, Inc., 505 U.S. 504 (1992), the Court flatly rejected the notion that the word "requirement" can refer only to positive laws and enactments. Construing the preemption clause in the 1969 Public Health Cigarette Smoking Act, which bars states from imposing any "requirement or prohibition based on smoking and health . . . . with respect to the advertising or promotion of . . . cigarettes," the Court said:

> [Petitioner] argues that common-law damages actions do not impose "requirement[s] or prohibition[s]" and that Congress intended only to trump "state statute[s], injunction[s], or executive pronouncement[s]." We disagree; such an analysis is at odds both with the plain words of the 1969 [Public Health Cigarette Smoking] Act and with the general understanding of common-law damages actions. The phrase "[n]o requirement or prohibition" sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, "[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."

Id. at 521 (citation omitted). Thus, Congress' use of the term "requirement" in these preemption clauses does not necessarily signal its intent to preserve state common-law causes of action.

6

Fortunately, the FHSA's legislative history provides the interpretative guidance that its language does not. See Medtronic, 518 U.S. at 486 (stating that interpretation of preemption clause should be informed by the purpose of the statute, including "the way Congress intended the statute and its surrounding regulatory scheme to affect, business, consumers, and the law"). According to the legislative record, the FHSA was enacted "to provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use." H.R. REP. 86-1861 at 1, (1960) reprinted in 1960 U.S.C.C.A.N. 2833, 2833. Given that stated purpose, Congress could not have intended "requirements" to exclude all common-law causes of action. If it did, then each state could use its tort law to enforce whatever labeling requirements it deemed fit, potentially creating fifty different labeling schemes. That is precisely the result Congress sought to avoid:

> The Committee hopes that this legislation will help toward the establishment of uniform, adequate, modern labeling requirements by the various states. Such uniformity now exists to a certain degree in some states which have labeling laws and regulations. In the absence of a federal law, there is a possibility that diverse labeling regulations will be adopted by the states, leading to a multiplicity of requirements and creating unnecessary confusion in labeling, to the detriment of the public.

Id., 1960 U.S.C.C.A.N. at 2835.

Indeed, interpreting "requirement" to include common law is the only way to prevent state common law from nullifying the preemption provisions. Congress' explicit ban on the enforcement of state labeling regulations that differ from those mandated by the FHSA would be meaningless if the states were free to incorporate such standards into their common-law duties of care. Thus, the term "requirements" must include common-law causes of action if the FHSA preemption clause is to have any effect at all.

7

It is also clear that Congress intended the PPPA to be interpreted in consonance with the FHSA. The PPPA was enacted as a supplement to the FHSA, to provide consumers an additional layer of protection from the hazards of toxic household substances:

> This proposed legislation is needed for the adequate protection of children from accidental poisoning. Despite the existing labeling laws, many thousands of young children each year are victims of accidental ingestion of common household products which are injurious to their health. In most instances, the toxic substances involved are packaged in containers easily opened by children. Precautionary labeling is also important to warn adults of the potential dangers, but such labels have no meaning for small children. What is needed is some type of container for potentially harmful household products which can be opened without difficulty by adults, but which will be resistant to being opened by children.

H.R. REP. 91-1642 (1970), reprinted in 1970 U.S.C.C.A.N. 5326, 5332. The statutes are interdependent; a substance deemed hazardous by the FHSA is subject to the PPPA, and a hazardous substance not packaged in accordance with the PPPA is deemed "misbranded" by the FHSA. See 15 U.S.C. §§ 1261(p), 1471(2)(A). Both statutes are administered by the CPSC, see 15 U.S.C. §§ 1261(d), 1262(a), (b), 1471(1), 1472(a), and both were amended in 1976 to make their preemption provisions consistent with each other and with those of the other statutes the CPSC administers. See H.R. CONF. REP. 94-1022 at 28, (1976) reprinted in 1976 U.S.C.C.A.N. 1017, 1030. Plainly, Congress intended the FHSA and PPPA to be two parts of a single, uniform regulatory scheme. Accordingly, the scope of the their virtually identical preemption provisions should be the same.

Our interpretation of that scope, plaintiffs say, is at odds with that of the CPSC. The agency interpretation to which plaintiffs refer is in the preamble to the CPSC's final rule on applications for preemption exemption under the FHSA, the PPPA and the other statutes it administers. It states:

> Springs Industries, Inc. suggested expanding the definition of "State or local requirement" contained in § 1061.2(f) to include standards or requirements applied as common or statutory law by a State or local court or a federal court exercising diversity jurisdiction. The commenter asserts that in litigation concerning the FFA,

> courts are applying a "reasonableness" standard that is inconsistent with Congressional intent to provide a nationwide standard. The American Textile Manufacturers Institute, Inc. expressed its support for Springs Industries' comment.
>
> The Commission does not believe that "standards" applied by courts should be included in the definition of "State or local requirement." Generally, courts do not establish prospective standards or regulations applicable to a category of persons, but instead deal with the specific parties before them. It is the Commission's view that the statutory preemption provisions were intended to address the legislative type of standard or regulation. Moreover, these procedures for application for exemption will be operative only once a State or local government recognizes that preemption may exist and, therefore, wishes to seek an exemption. It remains the role of the courts to determine whether a particular State or local standard or requirement is preempted.

56 Fed. Reg. 3414, 3415 (Jan. 30, 1991). Because the CPSC is the agency charged with enforcing the FHSA, plaintiffs contend that its view of the statute's preemptive scope is entitled to deference.

The Supreme Court has said that courts must defer to reasonable agency interpretations of the statutes they are charged to administer. Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 844 (1984). That deference is appropriate, however, only if "the intent of Congress is [un]clear." Id. at 842. If, on the other hand, "a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id. at 843 n.9; see Ragsdale v. Wolverine Worldwide, Inc., 218 F.3d 933, 936 (9th Cir. 2000) ("A court must not defer when it 'appears from the statute or legislative history that the [interpretation] is not one that Congress would have sanctioned.'") (quoting Chevron, 467 U.S. at 845), aff'd, 535 U.S. 81 (2002). Such is the case here. Congress' intent to establish uniform, national labeling and packaging requirements for hazardous substances is clearly stated in the statutes' legislative histories. Accordingly, we must effectuate that intent, regardless of the CPSC's views.

In short, we conclude that the preemption clauses of the FHSA and the PPPA expressly preempt both positive state enactments and common-law actions that seek to impose labeling and packaging requirements that are different from those imposed by those statutes -- a conclusion that is shared by courts around the country. See, e.g., Milanese v. Rust-Oleum Corp., 244 F.3d 104, 109 (2d Cir. 2001) (holding that the FHSA expressly preempts "any state cause of action that seeks to impose a labeling requirement different from the requirements found in the FHSA."); Comeaux v. National Tea Co., 81 F.3d 42, 43 (5th Cir. 1996) (per curiam) (affirming trial court's grant of summary judgment to state tort claim defendant on the alternative ground that "the FHSA preempts any state law warning requirements other than those imposed by the FHSA and its implementing regulations"); Hunnings v. Texaco, Inc., 29 F.3d 1480, 1488 (11th Cir. 1994) (noting that common-law claims that seek to supplement FHSA and PPPA requirements are expressly preempted); Moss v. Parks Corp., 985 F.2d 736, 740 (4th Cir. 1993) ("In actions such as the present one, if the plaintiff requests a label that is 'more elaborate or different' than the one required by the FHSA and its regulations, the claim is preempted.") (internal quotation marks and citation omitted); Cf. Kirstein v. Parks Corp., 159 F.3d 1065, 1067 (7th Cir. 1998) (noting that state tort claims against lacquer thinner manufacturer would be preempted by the FHSA).[2]

The next question is whether plaintiffs' claims run afoul of the preemption clauses; that is, whether their claims seek to impose requirements that are different from those mandated by the statutes. The answer, with respect to the FHSA, is yes. The most straightforward example is plaintiffs' breach of implied warranty of merchantability claims. In those claims, plaintiffs seek to

---

[2]Having determined that the FHSA expressly preempts such common-law claims, we need not address defendants' contentions that the claims are preempted under the doctrines of conflict and field preemption.

hold SCJ liable for selling a product that was inadequately labeled and did not conform to the statements of fact made on the label. (Second Am. Compl. ¶ 47a, b). Plaintiffs do not, however, allege that the Drano label violates the FHSA. Absent such allegations, success on these breach of implied warranty of merchantability may impose labeling requirements that are different from those imposed by the FHSA. They are, therefore, preempted.[3]

In addition to the warranty of merchantability claims, plaintiffs also assert claims against defendants for: (1) their failure to instruct users on the safe closing and sealing of the Drano container; and (2) their failure to warn users of the "unreasonably dangerous conditions" that existed in the Drano container. Though none of these claims contains the word "label," they are still preempted by the FHSA. The only way defendants could have instructed or warned consumers about the Drano container is by printing the information on the container or in accompanying literature, both of which are "labels" under the FHSA. See 15 U.S.C. § 1261(n); 16 C.F.R. § 1500.3(b)(12). The statute's preemption clause bars a state from imposing a labeling requirement that is different from those mandated by the FHSA and is "designed to protect against the same risk of illness or injury." 15 U.S.C. § 1261, Note (b)(1)(A). The standard of care plaintiffs seek to enforce through their failure to instruct and failure to warn claims is designed to protect against the same risk of

---

[3] Of course, if plaintiffs' common-law claims were premised on defendants' failure to comply with the FHSA and the PPPA, the result would be different. See Milanese, 244 F.3d at 109 ("[A] state cause of action alleging non-compliance with the FHSA would *not* be preempted by the Act."); Moss, 985 F.2d at 740-41 ("[S]o long as a plaintiff charges a manufacturer with violations of FHSA-mandated labeling requirements and does not seek more stringent labeling requirements, the Plaintiff's common law tort action for damages is not preempted."); cf. Chambers v. Osteonics Corp., 109 F.3d 1243, 1247-48 (7th Cir. 1997) (holding that state claw claims for strict liability and breach of implied warranty of merchantability, which sought to impose requirements on medical device manufacturer that were different than those mandated by the FDA, were preempted by federal law but the negligence claim premised on the manufacturer's failure to follow FDA-mandated procedures was not).

11

injury – accidental poisoning by household products – as the FHSA requirements. Because plaintiffs do not allege that the Drano label violates the FHSA, success on these claims could impose on defendants labeling requirements that are different from those mandated by the FHSA. Consequently, the failure to instruct claims asserted by plaintiffs in paragraphs 19c, 27j, 37d, 56f, 64j, 74c, 83c, 91c, 101c and the failure to warn claims asserted by plaintiffs in paragraphs 19f, 27s, 37c, 56i, 64m, 74c, 83m, 91m, 101e of the second amended complaint are preempted.

The willful and wanton conduct and strict liability claims that plaintiffs assert against SCJ in paragraphs 27k, l, m, n and 37j, k, l, m of the second amended complaint suffer the same fate. In those claims, plaintiffs seek to hold SCJ liable for putting Drano into the stream of commerce, despite the company's awareness that the containers were "defective and unreasonably dangerous." In other words, plaintiffs seek to hold SCJ responsible for selling Drano without warning consumers of the alleged danger the container posed. Thus, for the reasons discussed above, they too are preempted.

As currently pled, plaintiffs' package design claims are preempted as well. The PPPA bars states from imposing child-resistant packaging requirements that are different from those imposed pursuant to the statute. 15 U.S.C. §§ 1471(4), 1472(a), 1476(a). Plaintiffs have not alleged that the Drano container violates the special packaging requirements promulgated under the PPPA. Consequently, plaintiffs' claims that the Drano container is insufficiently child-resistant because it does not have adequate safety mechanisms or is otherwise amenable to being opened by young children, and their claim that SCJ has breached the implied warranty of merchantability by packaging its product in a child-friendly container, could impose packaging requirements upon defendants that are different from those mandated by the PPPA. The claims plaintiffs assert in paragraphs: 19a, b,

12

d, e, p; 27a, b, o, q, r; 37a, b, n; 47a; 56a, b, g, h; 64a, b, k, l; 74a, b; 83a, b, k, l; 91a, b, k, l; and 101a, b of the second amended complaint are, therefore, preempted.

Plaintiffs do not, however, limit their challenges to the adequacy of the child-resistant features of the Drano container. Rather, they also challenge the general efficacy of its cap, claiming that it has a propensity to open spontaneously because of poor fit, a defective latch or the absence of a pressure release valve. Those claims are beyond the scope of the PPPA's preemption clause, plaintiffs say, because: (1) they attack a general defect in the container, not a defect in the child-resistant packaging; and (2) they charge defendants with negligence for failing to incorporate a specific design feature in the Drano container, an area the CPSC is not permitted to regulate. See 15 U.S.C. § 1472(a), (d) (authorizing CPSC to enact regulations setting standards for child-resistant packaging but prohibiting it from "prescrib[ing] specific packaging designs").

The Court disagrees with both contentions. The general defect claims are just a restatement of plaintiffs' claim that the Drano container is insufficiently child-resistant. Plaintiffs do not allege, for example, that James was injured when the Drano container opened and the drain cleaner spilled on him while he was riding in a grocery cart or playing near the shelf where it was stored. Rather, they say that the three-year old was able to access and ingest the product because the container had a defective cap. (See Pl.'s Opp. Defs.' Mot. Dismiss at 2.) The former is a general defect claim beyond the purview of the PPPA. The latter, however, is a claim that the Drano container is insufficiently child-resistant, which is preempted by the PPPA.

The same is true for the "design feature" claims. Plaintiffs do not claim that the absence of a pressure release valve caused the drain cleaner to spill or spray on James. They say that its absence allowed him to access and ingest a harmful amount of the cleaner. In other words, plaintiffs contend

13

that a pressure release valve would have prevented the child from getting access to the poison, the entire purpose of child-resistant packaging. Though, as plaintiffs point out, the CPSC could not have required defendants to incorporate a pressure release valve or any other particular design feature into the Drano container, it could have required them to design a package that was not prone to spontaneous opening. Because the CPSC has not done so, plaintiffs' success on these claims could impose a special packaging requirement that is different from those mandated by the PPPA. The claims that plaintiffs assert in paragraphs 19g, h, i, j, k; 27c, d, e, t, u; 37e, f, g, i; 56c, d, e, n, o; 64c, d, e, n, o; 74d, f, g; 83d, e, f, n, o; 91d, e, f, n, o; and 101d, f, g of their second amended complaint, therefore, are preempted.

Plaintiffs also contend that defendants failed to test the Drano container adequately. (See Second Am. Compl. ¶¶ 19l, m, n, o; 27f, g, h, i; 56j, k, l, m; 64f, g, h, i; 83g, h, i, j; and 91g, h, i, j.) Among the special packaging requirements promulgated by the CPSC pursuant to the PPPA is a set of detailed testing protocols. See 16 C.F.R. § 1700.20. Those regulations specify what packages must be tested, the age and gender of the children to be used as test subjects, the procedures for each test, the number of tests that must be run, the pass/fail rates and the data that must be recorded. Id. Plaintiffs do not allege that the tests defendants performed on the Drano container did not comply with these regulations. To the extent these claims challenge the adequacy of defendants' tests on the container's child-resistant features, they are preempted. To the extent they challenge the adequacy of defendants' tests on any other features of the container, they are not.

The same is true for plaintiffs "catchall" design claims. (See Second Am. Compl. ¶¶ 19q, r; 27p, v; 37h; 56p; 64p; 74h; 83p; 91p; 101h.) If these claims are based on the child-resistant features of the Drano container, they are preempted. Otherwise, they are not.

14

## Conclusion

For the reasons set forth above, defendants' Rule 12(b)(6) motions to dismiss the claims asserted against them are granted. Plaintiffs have twenty-one days from the date of this Memorandum Opinion and Order to amend their claims in accordance with this Opinion, if they can do so and remain in compliance with Rule 11. If no amendment is filed in that time period, the claims will be dismissed with prejudice.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: _11-22-02_